UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 4359 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THOMAS DART, solely in his official capacity as Sheriff of Cook County, Illinois, COUNTY OF COOK, and GREGORY KULASA, Cook County Sheriff's Officer, Star 337, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Carlos Martinez brings this suit against Cook County Sheriff Thomas Dart in his official capacity, Cook County police officer Gregory Kulasa, and Cook County itself, alleging that Kulasa violated his Fourth Amendment rights and committed state law torts by unreasonably detaining and using excessive force against him. Doc. 42. Defendants move for summary judgment. Doc. 89. The motion is granted to the extent Martinez has not opposed it, and otherwise is denied.

**Background**

The court recites the facts as favorably to Martinez as the record and Local Rule 56.1 permit. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

The incident in question occurred in June 2019 near the junction of Dundee Road and Route 53 in Palatine, Illinois. Doc. 91 at ¶¶ 6, 11; Doc. 98 at ¶¶ 6, 11. There is a Shell gas station near the junction, across Dundee Road from a Motel 6. Doc. 91 at ¶ 8; Doc. 98 at ¶ 8. It

1

is a high-crime area: The Shell station was robbed twice the year before the incident, and there was a homicide months earlier in a nearby apartment complex. Doc. 91 at ¶¶ 6-7; Doc. 98 at ¶¶ 6-7.

On the night of June 2, Martinez drank alcohol at a casino, smoked marijuana, and ended up in a room at the Motel 6, where he snorted cocaine with two young women. Doc. 91 at ¶¶ 9-13. After a man entered to check on the women, Martinez became uncomfortable and left. *Id*. at ¶¶ 14-16. (Martinez objects on evidentiary grounds to Defendants' assertion of those facts. Doc. 100 at 5. Because summary judgment is denied as to the claims Martinez defends, the court overrules his objection as moot. In so doing, the court expresses no view on whether those facts are true, relevant, or admissible. Martinez may reassert his objections in a motion *in limine*.)

At about 2:00 a.m. on what had become June 3, Martinez went to the parking lot of the Motel 6, intending to get into his truck and leave. Doc. 91 at ¶ 17; Doc. 98 at ¶ 17. He then saw a light being shined in his face. Doc. 91 at ¶ 18; Doc. 98 at ¶ 18. Martinez thought the light was coming from someone trying to rob him, so he fled across Dundee Road to the Shell station. Doc. 91 at ¶¶ 19-20; Doc. 98 at ¶¶ 19-20.

Martinez entered the Shell's convenience store, looked around briefly, and left after about 10 or 15 seconds without buying or saying anything. Doc. 91 at ¶¶ 21, 25; Doc. 98 at ¶¶ 21, 25. He crossed Dundee Road to return to his truck in the Motel 6 parking lot, but once again saw a light shining in his direction. Doc. 91 at ¶ 23; Doc. 98 at ¶ 23. This time he ran down Dundee Road and across the Route 53 off-ramp. Doc. 91 at ¶ 24; Doc. 98 at ¶ 24. Still thinking he was being pursued by robbers, he hid by the side of the highway. Doc. 91 at ¶ 24; Doc. 98 at ¶ 24.

Officer Kulasa first noticed Martinez while he was walking toward the Shell station. Doc. 91 at ¶ 22; Doc. 98 at ¶ 22. Based on Martinez's quick exit from the convenience store,

2

Kulasa suspected that he had stolen something. Doc. 91 at ¶¶ 25-26; Doc. 98 at ¶¶ 25-26. Kulasa entered the store and talked to the clerk, who reported that she had no idea what had just happened with Martinez. Doc. 91 at ¶¶ 27-28; Doc. 98 at ¶¶ 27-28. Kulasa then saw Martinez running down Dundee Road toward Route 53 and figured that he was fleeing because he had seen Kulasa's police vehicle. Doc. 91 at ¶ 29; Doc. 98 at ¶ 29.

As Martinez was running across Dundee Road toward the off-ramp, he was spotted by a police officer from the Palatine Police Department. Doc. 91 at ¶ 30; Doc. 98 at ¶ 30. After consulting with the Palatine officer, Kulasa saw Martinez enter a grassy area on the side of the highway. Doc. 91 at ¶ 34; Doc. 98 at ¶ 34. Kulasa approached Martinez, who was hiding in some shrubbery with knee-high branches. Doc. 91 at ¶¶ 33, 36, 40; Doc. 98 at ¶¶ 33, 36, 40.

From this point forward, the court has the benefit of footage from Kulasa's body-worn camera. Doc. 93-2; *see* Doc. 91 at ¶ 49; Doc. 98 at ¶ 49; *see Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (holding that a court can rely on video footage at summary judgment). Kulasa approached the shrubbery and yelled, "Let me see your hands!" several times, and then screamed, "On the floor, on the floor! Now! On the floor!" Doc. 93-2 at 1:24-:33; Doc. 98 at ¶ 42. Martinez responded, "I'm on the floor. Don't shoot, please." Doc. 93-2 at 1:32-:34. Kulasa responded by yelling: "Hands! Let me see your hands!" and "Hands up, on the floor, on the floor!" Doc. 93-2 at 1:35-:41; Doc. 98 at ¶ 42. Martinez continued to plead with Kulasa and explain that he was complying with Kulasa's demands. Doc. 93-2 at 1:35-:41. (Defendants contest these facts, relying on Kulasa's deposition testimony that he told Martinez, "[T]his is the Cook County Sheriff. Please come out. We want to talk [to] you." Doc. 91 at ¶ 42 (quoting Doc. 91-2 at 127). Even if the court were not required at summary judgment to resolve this

3

dispute in Martinez's favor, the body-worn camera footage supports Martinez's version of the facts on this point and is inconsistent with Kulasa's.)

When Kulasa got close to the shrubbery, he saw Martinez on the ground. *Id*. at ¶ 44; Doc. 98 at ¶ 44. Because Kulasa did not know whether Martinez was armed, he drew his Taser while yelling at Martinez. Doc. 91 at ¶¶ 46-47; Doc. 93-2 at 1:22; Doc. 98 at ¶¶ 46-47. Martinez did his best to comply with Kulasa's commands, but it was difficult to do so because Kulasa was yelling both for Martinez to put his hands in the air and for him to get on the ground. Doc. 93-2 at 1:25-:41; Doc. 98 at ¶¶ 50-51. Kulasa was able to verify that Martinez did not have a weapon. Doc. 91 at ¶ 51.

Holding his Taser in his right hand, Kulasa moved some branches to get closer to Martinez. Doc. 93-2 at 1:40-:42; Doc. 98 at ¶ 52. A moment later, Martinez yelled, "Ow!" when a twig entered his left ear as his head was forcefully pressed against the ground. Doc. 93-2 at 1:42; Doc. 98 at ¶ 52. Seconds later, Palatine police officer Heuertz arrived and handcuffed Martinez. Doc. 91 at ¶¶ 53, 55; Doc. 93-2 at 1:45-:55; Doc. 98 at ¶¶ 53, 55. Eventually, the officers released Martinez after confirming that he had no outstanding warrants. Doc. 91 at ¶¶ 65-70; Doc. 98 at ¶¶ 65-70. An ambulance transported Martinez to the hospital. Doc. 91 at ¶¶ 71-72, 74; Doc. 98 at ¶¶ 71-72, 74.

At this point, the court pauses to note Defendants' view that Kulasa never made physical contact Martinez, let alone press his head against the ground. Doc. 91 at ¶¶ 52, 57, 59. However, at the crucial moment when Martinez yelled "Ow," Kulasa's body-worn camera was pointing away from Martinez, Doc. 93-2 at 1:41-:44, so it is impossible to tell from the footage exactly how he was injured. Therefore, the court must take Martinez's view of this critical factual dispute.

Martinez suffered severe injuries from the incident. Doc. 98 at ¶ 52. Surgery was required to dislodge the twig from his left ear. *Ibid*. He has lost all hearing in that ear, and the left side of his face remains paralyzed. *Ibid*.

## Discussion

The operative complaint asserts the following counts: (1) a 42 U.S.C. § 1983 claim against Officer Kulasa for using excessive force in violation of the Fourth Amendment, Doc. 42 at ¶¶ 24-28; (2) a state law battery claim against Kulasa, *id*. at ¶¶ 29-32; (3) a § 1983 claim against Kulasa for an unlawful detention in violation of the Fourth Amendment, *id*. at ¶¶ 33-35; (4) a state law false arrest claim against Kulasa, *id*. at ¶¶ 36-38; (5) a *respondeat superior* claim against Sheriff Dart for the state law torts committed by Kulasa, *id*. at ¶¶ 39-41; and (6) an indemnification claim against Cook County, *id*. at ¶¶ 42-45. (Martinez initially named the Village of Palatine and Officer Heuertz as defendants, but voluntarily dismissed his claims against them. Docs. 80-81.) Martinez concedes that Defendants are entitled to summary judgment on his Fourth Amendment unlawful detention claim and his state law false arrest claim, Doc. 100 at 14-15, so Defendants are granted summary judgment on those claims. The other claims are discussed in turn.

**I.      Fourth Amendment Excessive Force and State Law Battery Claims**

A Fourth Amendment excessive force claim is "evaluated for objective reasonableness based upon the information the officer[] had when the conduct occurred." *Harrington v. Duszak*, 971 F.3d 739, 741 (7th Cir. 2020) (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)). In evaluating an officer's conduct, the court must take care to "judge[] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In particular, the court must consider "the severity of the crime at issue, whether the

5

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Strand v. Minchuk*, 910 F.3d 909, 914 (7th Cir. 2018) (quoting *Graham*, 490 U.S. at 396).

Defendants argue that "the video evidence clearly shows that Officer Kulasa … made no physical contact with Plaintiff prior to him lying face down on the ground, and that the only contact made after that point (if any) was merely assisting other officers with administering handcuffs." Doc. 89 at 9. As noted, Kulasa's body-worn camera was pointing away from Martinez at that key moment, so the court disagrees that the video clearly supports Defendants' view of the facts. Granted, Defendants are not unreasonable in arguing that it is difficult to imagine how Kulasa could have pressed Martinez's head into the ground if he was holding a Taser in his right hand and pushing bushes aside with his left. *Id*. at 4, 8-9. Indeed, to have struck Martinez in the manner Martinez suggests, Kulasa would have had to have moved unusually fast with his left hand or used his legs. But the court must view the evidence in the light most favorable to Martinez, and thus cannot draw any factual conclusions about whether his head was pressed into the ground, or by whom, with the level of confidence necessary to grant summary judgment to Defendants. *Cf. Scott*, 550 U.S. at 380-81 (discounting the plaintiff's version of the facts because they were "so utterly discredited by the [video] that no reasonable jury could have believed him").

On the required assumption that Kulasa contacted Martinez with sufficient force to drive a stick through his ear, it becomes clear that Kulasa used excessive force. While Martinez had been acting suspiciously, neither Kulasa nor any other officer had seen him commit a crime. Kulasa concedes that at the time of the injury, he recognized that Martinez did not have a gun. Doc. 91 at ¶¶ 47, 51. And far from resisting arrest or attempting to flee, Martinez was on the

6

ground, complying with the officers' orders, and pleading with them not to hurt him. No objectively reasonable officer would have felt a need, under those circumstances, to use a degree of force sufficient to drive a stick through a suspect's ear. *See Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (holding that the officer used excessive force by slamming the plaintiff's head into a wall and Tasering him despite his lack of resistance); *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002) (holding that the officer used excessive force by shoving an arrestee on the ground despite a lack of resistance or evidence of criminal activity).

As to Martinez's state law battery claim, Defendants again rely on the video to "confirm[] that Officer Kulasa never made physical contact with Plaintiff." Doc. 89 at 11. For the reasons just given, the video does not show this with the clarity necessary on summary judgment. Defendants provide no other reason why Kulasa's alleged conduct would not constitute battery under Illinois law, and no such reason is apparent. *See Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 871 (7th Cir. 2011) ("Battery is defined under Illinois law as follows: 'A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.'") (quoting 720 ILCS 5/12-3); *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) ("Under Illinois law, battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.' The record contains facts that, if accepted by a jury, would meet this definition.") (citation omitted) (quoting *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. 1995)).

Defendants contend that qualified immunity protects Officer Kulasa from liability as to the Fourth Amendment excessive force claim. Doc. 89 at 20-22. "On summary judgment, the qualified immunity defense depends on two questions: '(1) whether the facts, taken in the light

most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time.'" *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021) (alteration in original) (quoting *Est. of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)).

The facts, viewed in the light most favorable to Martinez, are that Officer Kulasa struck Martinez while he was lying on the ground, complying with orders, and posing no threat whatsoever. For the reasons given above, on those facts Kulasa violated Martinez's Fourth Amendment rights. And on those facts, Kulasa is not entitled to qualified immunity. At the time of the incident, and for years beforehand, "it was clearly established that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'" *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) (quoting *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)). As the Seventh Circuit observed in *Payne*, "[i]t [i]s also well established that it [i]s unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes." *Ibid*. That observation makes the qualified immunity question here an easy one. If officers must take care not to "yank the arms" while arresting those who have committed crimes, it follows *a fortiori* that officers may not push into the ground (with enough force to lodge a twig in the ear) the heads of unarmed, compliant individuals about whom the officers have only the slightest wisps of suspicion. *See ibid*. (collecting cases denying qualified immunity to officers who use excessive force while arresting compliant suspects).

As to the state law battery claim, Defendants invoke the Illinois Tort Immunity Act, which states in relevant part that "[a] public employee is not liable for his act or omission in the

8

execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Defendants argue that Officer Kulasa's conduct could not have been "willful and wanton" because "[t]here is no evidence that [he] did anything wrong." Doc. 89 at 23. Again, there *is* enough evidence in the record to allow a reasonable jury to find that Kulasa struck Martinez while he was on the ground, complying with instructions, and posing no threat. And Defendants provide no reason why, as a matter of law, a jury could not also find that such conduct was "willful and wanton." *See Carter v. Simpson*, 328 F.3d 948, 951-52 (7th Cir. 2003) (holding that summary judgment based on the Tort Immunity Act is unavailable if the defendant's conduct, "when construing the evidence in [the plaintiff's] favor," could qualify as willful and wanton).

Accordingly, summary judgment is denied as to the Fourth Amendment excessive force and state law battery claims.

## II. *Respondeat Superior* and Indemnification Claims

As to Martinez's *respondeat superior* and indemnification claims, Defendants argue only that there is no underlying liability and thus nothing to impute or indemnify. Doc. 89 at 20. Because the court cannot conclude that Kulasa has no liability as to Martinez's Fourth Amendment excessive force and state law battery claims, summary judgment on the *respondeat superior* and indemnification claims is denied.

**Conclusion**

Defendants' summary judgment motion is granted as to the Fourth Amendment wrongful detention claim and state law false arrest claim, and otherwise is denied. This case will proceed to a jury trial on February 28, 2022. Doc. 110. A pretrial schedule has already been set. *Ibid*.

August 4, 2021

_____
United States District Judge